**MONROE AUTO EQUIPMENT COM-PANY, Appellant,**

v.

**SUPERIOR INDUSTRIES, INC.,**
**Appellee.**

**No. 18998.**

United States Court of Appeals
Ninth Circuit.

May 22, 1964.

474

Harness, Dickey & Pierce, Don K. Harness, Detroit, Mich., Lyon & Lyon, Charles G. Lyon, Los Angeles, Cal., for appellant.

Fulwider, Patton, Rieber, Lee & Utecht, Francis A. Utecht, Los Angeles, Cal., for appellee.

Before BARNES, MERRILL and DUNIWAY, Circuit Judges.

BARNES, Circuit Judge:

This appeal is from a final judgment in a patent infringement action. 28 U.S.C. § 1338(a) and (b). Jurisdiction here rests upon 28 U.S.C. § 1291.

Two patents are involved, United States Patent No. 2,896,938 and No. 2,912,235 (hereinafter referred to as the '938 patent and the '235 patent, respectively).

Appellant sued for contributory infringement and active inducement to infringe '938 and Claim 14 of '235. Appellee denied infringement, and validity of the patents, and counter-complained for unfair competition and harassment. By pre-trial order, only Claims 2, 3 and 4 of '938 and Claim 14 of '235 were in suit.

After trial, the court below ordered judgment for defendant on the complaint; declared the patents invalid, and ruled defendant had failed to sustain the counter-claim for unfair competition and attorney's fees.

A motion for new trial was made by appellant on the ground of newly discovered evidence; and by stipulation, the evidence (a deposition) was admitted in evidence. The motion for new trial was dismissed. After reconsideration, the trial judge reaffirmed his original decision.

The question of infringement was not ruled on below, because of the trial court's view of invalidity.

## I

The patents and claims in suit relate to a simple suspension device, commonly known as a shock absorber. Its uniqueness lies in a sleeve placed within the coiled spring surrounding the shock absorber.[1] Patent '938 was described by the court below in Finding of Fact 12 as follows:

"12. Patent No. 2,896,938 in suit relates to an auxiliary vehicle suspension device that includes a conventional tubular shock absorber disposed within a coil spring. The shock absorber consists of two parts, one being a body portion 10 and the other a piston and rod. The piston rod telescopes into the body portion when the shock absorber is compressed. The piston rod is connected at its upper portion to a depending dust guard 11 having an outwardly flaring flange 11a at its bottom. The ends of the coil spring are supported with respect to the relatively movable parts of the shock absorber. The specification of this patent recites 'A sleeve 86 of non-metallic rubber or fiber material fits between the adaptor 80 and the flange 11a of the dust guard 11'. *It is the addition of this sleeve 86 to the prior art combination of a tubular shock absorber disposed within a coil spring that provides the basis for the assembly recited in Claims 2, 3 and 4 of Patent No. 2,896,938.*" (Emphasis by appellee.)

The claimed uniqueness in the second patent (Claim 14 of '235) is the installation of the device above described in a "sea-leg" manner, i. e., at an angle or incline, instead of straight up and down; so as to resist lateral movement or side-

---

1. The claims of the '938 patent in suit read as follows:

"2. In a suspension device, a hydraulic direct-acting tubular shock absorber having relatively movable telescopic parts, a coil spring disposed substantially concentrically with respect to said shock absorber, means on one of said relatively movable shock absorber parts engaging and supporting one end of said coil spring, means on the other of said relatively movable shock absorber parts engaging and supporting the opposite end of said coil spring, and an elongated nonmetallic resilient tubular spacer sleeve fitted over said shock absorber and resisting lateral movement of said coil spring so that the coil spring is maintained in substantially concentric relationship with respect to said shock absorber.

"3. In a suspension device, a hydraulic direct-acting tubular shock absorber having relatively movable telescopic parts, a coil spring sleeved over said shock absorber, the inside diameter of said spring being larger than the outside diameter of said shock absorber, an elongated nonmetallic tubular spacer sleeve fitted over said shock absorber and disposed in the space between said shock absorber and said coil spring, said spacer sleeve resisting lateral movement of the coil spring so that said shock absorber and coil spring are maintained in spaced substantially concentric relationship.

"4. In a suspension device, a hydraulic direct-acting tubular shock absorber including relatively movable telescopic parts, one of said parts including an elongated body member and the other of said parts including a rock guard disposed exteriorly of and in concentric relation with said body member, a coil spring disposed substantially concentrically around said shock absorber, means on one of said relatively movable shock absorber parts engaging and supporting one end of said coil spring, means on the other of said relatively movable shock absorber parts engaging and supporting the opposite end of the said coil spring, and an elongated nonmetallic tubular spacer sleeve fitted over said shock absorber rock guard and resisting lateral movement of said coil spring so that said coil spring is maintained in substantially concentric relationship with respect to said shock absorber."

sway, and combine a vertical smoothness.[2]

The heart of the invention claimed in '938 is the "non-metallic, tubular spacer sleeve." Being between the inner hydraulic shock-absorber and the outer concentric coil spring, it is claimed (in Claim 2) that it maintains substantial concentric relationship between the absorber and the coil spring, and resists lateral movement of the coil spring. This sleeve is claimed to prevent noise (if made, for example, with rubber), prevent excessive "buckling" or thrashing of the spring, and prevent wear and tear between the metal of the shock absorber and the metal of the coil spring.

## II

The errors of the trial court were alleged to have been:

(1) In holding the prior art was such that the subject matter of Claims 2, 3 and 4 of '938 was *obvious* to one having ordinary skill in the automobile vehicle suspension art.

(2) In finding the usual presumption of validity of a patent was dissipated because certain *prior art* was not considered by the Patent Office in connection with the prosecution of the patent in suit.

(3) In finding the combination of tubular shock absorber, coil spring and rubber sleeve was a mere *aggregation of old elements*, without change in their function, and hence without invention.

(4) In finding the Knoedler Patent *anticipated* '938.

(5) In finding *prior use* by Knoedler in 1953 of the device.

(6) In finding the Knoedler device was *reduced to practice* before the filing date of the '938 patent, i. e., prior to May 6, 1954, and was not "abandoned."

(7) In holding that the Knoedler literature disbursed in 1953 discloses and completely anticipates the invention claimed in 2, 3 and 4 of '938.

(8) In not finding contributory infringement and actively induced infringement in appellee with respect to '938.

(9) In holding the same obviousness existed as to Claim 14 of '235 as was found in (1) above as to '938.

(10) In holding the same regrouping of *old elements* without change of function with respect to '235 as was found in (3) above with respect to '938.

(11) In finding the same *anticipation* by Knoedler with respect to '235 as was found with respect to '938 in (4) above.

2. Claim 14 of the '235 patent reads as follows:

"14. In a rear suspension system for an automotive vehicle, the combination comprising a spring assembly and an unsprung assembly, said unsprung assembly comprising a rear axle and a pair of laterally spaced ground engaging wheels mounted on said axle, a main suspension spring disposed adjacent each said wheel and connected with said sprung and unsprung assemblies so as to act in a general vertical direction to yieldably support said sprung assembly on said unsprung assembly for relative vertical movement, a pair of angularly extending auxiliary coil springs, disposed between said sprung and unsprung assemblies, an angularly disposed hydraulic direct acting tubular shock absorber extending through each of said coil springs, each of said shock absorbers including relatively moveable telescopic parts, means on each of said shock absorber parts engaging and supporting the opposite ends of the adjacent coil spring so that telescoping and extension of said shock absorber parts and compression and extension of said coil springs occurs simultaneously, one of said parts of each of said shock absorbers being connected with said rear axle of said unsprung assembly adjacent one of said main suspension springs, the other part of each of said shock absorbers being connected with said spring assembly laterally inwardly of the connection to said unsprung assembly so that each said shock absorber and the adjacent coil spring extends angularly between said sprung and unsprung assemblies so as to provide a lateral component to resist lateral sway of said sprung assembly relative to said unsprung assembly while simultaneously adding a vertical component to the resistance to vertical movement provided by said main springs between said sprung and unsprung assemblies."

(12) In finding the same *reduction to practice* by Knoedler with respect to '235 as was found with regard to '938 in (6) above.

(13) In finding the same disclosure and anticipation in the Knoedler literature with respect to '235 as existed with respect to '938 in (7) above.

(14) In failure to find the infringement and actively induced infringement with respect to '235 as was claimed with respect to '938 in (8) above.

### III

Appellant seeks to establish these errors: (a) the lack of obviousness (b) by reference to unsolved problems in the art, (c) the commercial success of appellant's device, (d) the number of licenses appellant has issued, (e) the alleged slavish copying by appellee of the patented device, (f) the simplicity of the device, (g) that the patent office considered "the most pertinent" prior art, (h) that Knoedler's device had not been reduced to practice, and had been abandoned, (i) that much evidence re use, construction, testing, operation and disclosure of the Knoedler device was confusing and contradictory.

■■ What appellant desires us to do with respect to the obvious lack of invention found in appellant's device is to substitute our judgment for that of the trial court. This we cannot do if it involves a finding of fact. (Rule 52(a).) But the finding of validity, i. e., whether or not there is invention, is, of course, a matter of law, not of fact. We think what was said by Judge Pope in his concurring opinion in Bergman v. Aluminum Lock Shingle Corp. of America, 9 Cir. 1957, 251 F.2d 801 at 809, is applicable here:

"In this case there was no patentable invention for the simple reason that it comes precisely within the language of Lincoln Engineering Co. of Illinois v. Stewart-Warner Corp., 303 U.S. 545, 549, 58 S.Ct. 662, 664, 82 L.Ed. 1008: 'The mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them is not patentable invention.' The quoted statement is a rule of law. It sets a legal standard or test of invention. For failure to meet this legal standard appellee must fail. Thus we determine that there is no invention here as a matter of law."

Cf. also: Pressteel Co. v. Halo Lighting Products, Inc., 9 Cir. 1963, 314 F.2d 695, 697–698, and cases cited therein.

■■ Merely to label the trial court's determination as "subjective hindsight" does not determine the issue. We agree thoroughly that subjective hindsight is not a proper test. Nor does the simplicity of a device negate an invention. Goodyear Tire & Rubber Co., Inc. v. Ray-O-Vac Co., 1944, 321 U.S. 275, 279, 64 S.Ct. 593, 88 L.Ed. 721.

Having said that much, we must cross the next hurdle: Was subjective hindsight applied here to this very simple device? It can be argued with some truth the more simple the device, the more difficult it may well be to invent it. Yet a device does not become invention merely because it is simple any more than it does because it resembles a Rube Goldberg creation or other apparatus of considerable complexity.

Counsel for appellant has assumed that the trial court failed to look at the various objective criteria of invention. We discuss them in turn:

(a) "The long felt need for the invention."

The court, in its wisdom, found the prior art anticipated this device—in that it was admittedly a "combination patent" of old elements, without change in function.

The hydraulic tubular piston type direct action shock absorber was defined in Finding 12 to be conventional. The appellee, Superior Industries, Inc., does not sell shock absorbers; merely a kit with springs, clamps and sleeves to "convert" the conventional device. The coiled sur-

rounding spring was old in the art. McIntyres Patent No. 2,874,955,[3] filed by plaintiff's employees on June 11, 1957, came to the conclusion that "many auxiliary or helper spring units have been developed and designed for use on vehicles. These helper springs have taken the form of coil springs, flat leaf type springs, air bags, etc. * * *" (Plaintiff's Ex. 42, File Wrapper, p. 3.) Coil springs are shown in the following cited pre-existing patents:

| | | |
|---|---|---|
| Dahlstrom | 1,471,474 | October 23, 1923 |
| Reese | 2,733,058 | January 31, 1956 |
| MacPherson | 2,624,592 | January 6, 1953 |

and perhaps

Carena (Italy) 466,870 November 20, 1951

(*Cf:* McIntyre File Wrapper, p. 38.)

3. Appellant makes the following explanation re patent No. 2,874,955:
"Two of Plaintiff's employees, namely, B. D. McIntyre and W. D. McIntyre, filed a patent application on Plaintiff's 'Load-Leveler' device in 1957, and this patent application matured into U. S. Patent No. 2,874,955 (hereinafter referred to as 'McIntyre '955 Patent'). For several years prior to 1957, a Mr. Brooks Walker of San Francisco, California, had been trying to interest Plaintiff in several devices or inventions which he had made, some of which related to overload suspension arrangements. From time to time, Mr. Walker discussed his various inventions with personnel of Plaintiff company and in 1959, after the McIntyre '955 Patent issued, Mr. Walker again approached Plaintiff company and advised Plaintiff's attorney that he had two patent applications which were filed in 1954 which he thought entitled him to patent protection which would cover and dominate Plaintiff's 'Load-Leveler' units. Mr. Walker furthermore, in accordance with approved Patent Office practice, copied claim 7 of McIntyre '955 Patent and inserted it in a patent application he had pending in the Patent Office and asked the Patent Office to declare an interference.
"The Patent Office did declare an interference and Plaintiff conceded that Walker was the first inventor and that this patent claim properly belonged to Walker. As a result the Walker '235 Patent issued and claim 14 of this patent is identical to claim 7 of the McIntyre '955

Significantly, the same McIntyre file wrapper states (pp. 39-40):

"As to the particular rate of the spring and the particular calibration of the valves, these are merely matters of arbitrary choice or mechanical design and have no patentable significance."

and:

"Merely to select a particular spring rate and to calibrate the shock absorber valves as recited in this claim involves nothing more than the exercise of routine engineering design and is not inventive."

These observations were not made by the patent examiner about the patents in suit, but are as applicable to them as to

Patent. As a result of Walker's priority, Plaintiff disclaimed claim 7 from the McIntyre '955 Patent.
"In addition, Walker after studying the file wrapper of the McIntyre '955 Patent found that claims 13 and 14 of the McIntyre patent application had not issued in the McIntyre '955 Patent because of the possible declaration of an interference in the Patent Office. Walker, because of his priority then copied claims 13 and 14 from the McIntyre application and inserted the claims in his patent application, serial number 769,967, which was a divisional application of his original patent application, serial number 427,927, filed May 6, 1954. It is clear from the various certified file wrappers (Ex. 42, 45, A and B) that the same Patent Office Examiner, a Mr. W. B. Wilbur, handled the prosecution of the patent application which resulted in the McIntyre '955 Patent, the original Walker application, and the Walker divisional application which resulted in the Walker '938 Patent and that claims 2 and 3 of the Walker '938 Patent in suit are identical with the aforementioned two claims which were in the McIntyre patent application. As a result of the aforementioned situation, Plaintiff purchased the Walker patent applications and the resulting '938 and '235 patents in suit and has paid substantial royalties to Walker on all 'Load-Leveler' suspension units sold by Plaintiff since June 1, 1950. (See agreement Ex. 21 and R. 303-307.)" (pp. 9-11, Appellant's Brf.)

any device showing a similar combination of commonly known members.

The elongated tubular spacer (made nonmetallic by amendment subsequent to the original patent application) is similar to the flexible sleeve (59) of MacPherson, "sleeved over tube 25, [preventing] spring 64 from contacting tube 25."

Magrum, No. 2,640,693, of June 2, 1953, likewise showed a rubber sleeve (60) located between a coil spring and shock absorber part.

Padgett, No. 2,092,259, of September 7, 1937, showed a rubber sleeve (60) between a dust guard and a cylinder of a shock absorber.

■ We agree with the trial court that the prior art anticipated and demonstrated the existence of the shock absorbers, the coil springs, and the sleeve, of various nonmetallic substances; and that their combination was not invention.

(b) Appellant urges as its second objective test the immediate success of the device:

(1) $26,000,000 worth sold from May 1957 to November 1962;

(2) Appellant's licensees sold $1,000,- 000 worth of patented devices and paid $60,000 in royalties in twenty-nine months;

(3) Appellee's sale of over $500,000 worth of the devices covered by the patents in suit.

This is all valid evidence of success, but it does not necessarily prove such success was proximately *and solely* caused by the genius of the invention.

It has already been pointed out appellee did not sell the entire patented device, merely kits containing articles similar to those of the patent sleeve, clamps and coil. It is also plainly evident that appellant carried on an aggressive, forceful campaign to license any and all shock absorber manufacturers who could be induced to buy a license,[4] and to obtain consent judgments from the same or similar manufacturers, who were willing (or who might prefer, for one reason or another) to avoid litigation.[5] One judgment was recovered against Champ-Items, Inc. for $1.00 damages.[6]

We also note that apparently all the foregoing consent decrees [7] awarded no

---

4. Plaintiff's Ex. 22, dated July 1, 1960, GorDag Industries, Inc.
 " " 24, dated July 1, 1960, Champ-Items, Inc.
 " " 28, notarized on August 8 and 9, 1960, dated July 1, 1960, Perfection Automotive Products Corp.
 Plaintiff's Ex. 29, notarized July 12 and 18, 1960, dated July 1, 1960, Medco Stamping Co.
 Plaintiff's Ex. 30, notarized July 18 and August 2, 1960, dated July 1, 1960, T. & R. Manufacturing Co.
 Plaintiff's Ex. 32, notarized November 16 and December 2, 1960, dated July 1, 1960, Larry Lewis Co.
 Plaintiff's Ex. 38, notarized October 19 and 26, 1962, dated October 1, 1962, Crown Spring Co.

5. Plaintiff's Ex. 23, dated July 18, 1960, GorDag Industries, Inc.
 " " 27, dated July 29, 1960, Champ-Items, Inc.
 " " 31, filed August 9, 1960, T. & R. Manufacturing Company.
 " " 33, filed December 7, 1960, Larry Lewis Co.
 " " 34, undated, Sumner's Automative, Inc.
 " " 35, dated December 23, 1959, H. J. Frye
 " " 36, filed April 4, 1960, Schrager Eng. Co.
 " " 37, dated January 5, 1960, Donald Osterhoudt

---

6. Plaintiff's Ex. 25, dated March 19, 1960.

7. With the exception of (1) Monroe Auto Equipment Co. v. Champ-Items, Inc., where $1.00 damages were awarded by a jury (Plaintiff's Ex. 25), and (2) Monroe Auto Equipment Co. v. H. J. Frye Co., dba H. J. Frye Auto Supply, where defendant consented to pay five per cent of the net profits from the sale of the one (only one) "unfringing" unit sold (Plaintiff's Ex. 35).

costs, no attorney's fees and no damages. In Monroe Auto Equipment Co. v. Heckethorn Mfg. & Supply Co., W.D.Tenn. 1961, 204 F.Supp. 249, the patent was held invalid in view of prior art and prior public knowledge and use of the Knoedler devices hereinabove mentioned.[8]

Thus a great deal could be surmised by one knowledgeable in patent law as to just how much was proved by consent decrees and licenses other than that the parties thereto usually were of a different economic level. We assume no facts, but we are realistic enough not to blind ourselves to the fact that many patents are "built up" by the wholesale use of consent decrees, without the merits of the invention ever having been tested in the courts.

■ We have repeatedly held that commercial success, however great, is but one factor in proving originality, i. e., invention. We have described it as a "make weight." Pressteel Co. v. Halo Lighting Products, Inc., 9 Cir. 1963, 314 F.2d 695, 699; Jaybee Mfg. Corp. v. Ajax Hardware Mfg. Corp., 9 Cir. 1961, 287 F.2d 228, 230.

Obviously, as appellant concedes, being but one factor, it is not controlling or conclusive on the issue.

■ (c) The payment of royalties to appellant.

We have discussed the evidence in this case on this subject under (b) above. We do not differ with the rule of law inferentially approved in Pursche v. Atlas Scraper & Eng. Corp., 9 Cir. 1962, 300 F.2d 467, 489, cert. den. 371 U.S. 911, 83 S.Ct. 251, 9 L.Ed.2d 170, reh. den. 371 U.S. 959, 83 S.Ct. 499, 9 L.Ed.2d 507, and expressed in Eibel Process Co. v. Minnesota & Ontario Paper Co., 1923, 261 U.

S. 45, 55–56, 43 S.Ct. 322, 67 L.Ed. 523; Campbell v. Mueller, et al., 6 Cir. 1947, 159 F.2d 803, 808–809; Coltman v. Colgate-Palmolive-Peet Co., 7 Cir. 1939, 104 F.2d 508, 511, cert. den. 308 U.S. 598, 60 S.Ct. 129, 84 L.Ed. 500, reh. den. 308 U.S. 637, 60 S.Ct. 178, 84 L.Ed. 529. We hold it good law, but not controlling law on the facts of this case.

(d) Appellant's third objective indicium is appellee's alleged precise copying. "Why doesn't Defendant," asks appellant,[9] " * * * eliminate the rubber sleeve and sell units made like the device disclosed in the prior art such as the French and Italian patents [?]" Defendant answers that it does, that it sells one third of its units without rubber sleeves; and that two of appellant's licensees (Exs. BH and BI) (GorDag Industries and Perfection Motor Products) sell their devices without a rubber sleeve, despite their payment of a five per cent royalty for the right to use it.[10]

■ Thus we agree with the theory expounded by appellant that where there *is* no evasion by even a variation of the details of a patented arrangement, but a precise copying of all details exists, a strong presumption arises that the precise form described by the patented arrangement is, without deviation, inevitably necessary. Yet the facts of this case do not require the conclusion of a precise copying, without material deviation, from what has been above stated.

And the evidence introduced by appellant (Ex. 60 and Rptr's Tr. pp. 1055–1058) of experiments performed without use of a rubber sleeve is at best persuasive, and not controlling.

(e) The simplicity of the device we have touched upon above under "obviousness."

---

8. The judgment in that case was vacated and remanded on other grounds, 305 F.2d 375, on remand was again found invalid, 214 F.Supp. 704; and such invalidity was affirmed on appeal. Monroe Auto Equipment Company v. Heckethorn Manufacturing and Supply Company, 6 Cir., 332 F.2d 406, decided May 14, 1964. (See particularly slip opinion, pp. 8 to 16, where the same points herein made by appellant are determined adversely to it.)

9. Opening Brief, p. 25.

10. GorDag makes a rubberized spring with rubber bonded on the coil (Ex.BH), while Perfection bonds a vinyl coating on the coil (Ex. BI).

(f) "The patent office considered the most pertinent prior art relied upon by defendant."

██ The argument is a two-edged sword. It assumes that "less pertinent" prior art existed, and that it was not considered by the Patent Office. The existence of but one pertinent [11] example of unconsidered prior art is not only sufficient basis to dissipate the presumption of validity (Pressteel Co. v. Halo Lighting Products, Inc., supra; Jaybee Mfg. Corp. v. Ajax Hardware Mfg. Corp., supra), but may render the patent invalid.

In the instant case, urges appellant, "the most pertinent prior art relied on by the defendant is either the same as prior art considered by the Patent Office, or is from nonanalogous fields having nothing to do with automobile suspension systems."

The district court, says appellant, was apparently misled in this issue, "because the prior arts patents relied on by defendant are not listed at the back of the patents in suit as prior art references of record." This, says the appellant, is not of real consequence, because W. B. Wilbur was the Patent Office Examiner who handled the '938 patent, the original Walker patent application on which '938 was based and the McIntyre patent application which resulted in the McIntyre '955 patent. Exs. 42, 45 and A.) Thus, says the appellant, he must have known of all prior art.[12]

Our attention is directed to two cases: Otto v. Koppers Co., Inc., et al., 4 Cir. 1957, 246 F.2d 789, cert. den. 355 U.S. 939, 78 S.Ct. 427, 2 L.Ed.2d 420, Mechanical Ice Tray Corp. v. Abraham & Strause, Inc., E.D.N.Y.1940, 31 F.Supp. 938. We find nothing in the second case to support appellant's theory. The Koppers case involved a patent in suit "issued upon an application which was a continuation in part and consolidation of several prior copending applications," in one of which the alleged prior art *was cited*. The superseding application and the earlier applications were handled by the same examiner. On this state of facts, it could not be said, (held the fourth circuit) that the prior art relied on had not been cited or considered (p. 801). We do not find the facts in Koppers similar in any marked degree to the facts of this instant case.

Finding 9 of the district court (Clk's Tr. pp. 89–90) found the following had been urged by defendant below as prior art:

| | | |
|---|---|---|
| French Patent | No. 1,044,393 | (Ex. E) |
| Italian " | No. 467,071 | (Ex. D) |
| Farmer, U.S. Patent. | No. 2,344,858 | (Ex. G) |
| Chayne, " " | No. 2,159,203 | (Ex. L) |

1953 English Ford Front Suspension Patent (Ex. BD-1)

———◆———

Finding 10 of the district court found (a) Exhibits E, D and BD–1 to show the tubular shock absorbers surrounded by a coil spring; (b) Exhibit G to show the rubber sleeve between the coil spring and a tubular metallic element; Exhibit BD–1 to show a rubber sleeve on the shock absorber; not intended to act as a

---

11. We do not need decide whether, if pertinent, it was less or most pertinent.

12. Appellant states no particular law is necessary to support this position. We do not agree. The examiner's mind, concerned with many patent prosecutions over a substantial period of time, is no more infallible than a judge's or a trial attorney's. The former cannot remember with certainty, in an opinion on one subject, all the positions he has taken in other cases involving the same legal principles, nor all the cases he has relied on to support his position. Nor can the average attorney, once having finished a case, remember all the cases he cited or considered in a previous case when preparing a new one.

spacer; (c) that the use of rubber between relatively movable metal parts to avoid metal to metal contact is old. (This was admitted by the plaintiff in pre-trial conference.)

Finding 14 found the prior art anticipating '938 was Exhibits E, D, G and BD-1.

Findings 15 to 18 found that the "sea-leg" mounting was old in the art, prior to '235, quoting a reference to such mounting that "most cars have adopted" in the S.A.E. Journal of 1949, and that it was disclosed in the Chayne patent (Ex. L), and that Claim 14 of '235 was anticipated generally by Exhibits L, E, D and Brooks Walker patent No. 2,518,733.

Finding 19 found that none of the patents suggested by the defendant as prior art (and as listed above) had been cited to the patent office.

It is true that the Farmer patent (Ex. G) is a railroad car brake cylinder device. We agree that this weakens the value of it, as bearing upon the patent in suit, issued in a different field. But all such argument as to what is "most pertinent" fades before the fact of existence of such prior art as was proved; the trial court's determination that it was not cited; and that it did in fact anticipate the claimed invention in Claims 2, 3 and 4 of '938, and Claim 14 of '235. The presumption of validity based upon the patents' issuance was thus weakened, and created an issue, whether of fact or law or both, decided adversely to appellant which we will not disturb on appeal.

Appellant's argument that the prior foreign art disclosed "unsatisfactory devices" assumes that tests made by defendant with Exhibit 59 ("the actual physical exhibit of the shock absorber and spring unit used in the two foreign patents, Exhibits D and E") establish without contradiction that Exhibits D and E would not "work." But the trial judge did not rest his conclusion on appellant's recreated devices, but on the teachings of the French (Ex. E) and Italian (Ex. D) patents. In other words, the experiments performed by appellant were not as conclusively persuasive on the trial judge as appellant would have us believe.

Appellant's position is that the admitted combination of old elements produced some "difficult to describe" new and useful results, and that we should disregard Great A. & P. Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162, which was relied upon by the district court. This we have in the past,[13] and now, decline to do.

We finally come to the Knoedler and Truedson hydro shock devices—claimed

13. As to the point concerning the patentability of a combination of old elements, this court has followed Great A. & P. Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162, in many cases, the more recent being: Hutchinson v. Pacific Car & Foundry Co., 9 Cir., 1963, 319 F.2d 756, 760; Aetna Steel Products Corp. v. Southwest Products Corp., 9 Cir., 1960, 282 F.2d 323, 332-333, cert. den. 365 U.S. 835, 81 S.Ct. 804, 5 L.Ed.2d 810; William T. Alvarado Sales Co. v. Rubaloff, 9 Cir., 1959, 263 F.2d 926, 930, cert. den. 360 U.S. 910, 79 S.Ct. 1295, 3 L.Ed.2d 1260; Gratiot v. Farr Co., 9 Cir., 1956, 237 F.2d 940, 941, cert. den. 352 U.S. 1026, 77 S.Ct. 592, 1 L.Ed.2d 597; Coleman Co. v. Holly Manufacturing Co., 9 Cir., 1956, 233 F.2d 71, 78-79, cert. den. 352 U.S. 952, 77 S.Ct. 326, 1 L.Ed.2d 243; Hunter Douglas Corp. v. Lando Products, 9 Cir., 1954, 215 F.2d 372, 375; Kwikset Locks v. Hillgren, 9 Cir., 1954, 210 F.2d 483, 486, cert. den. 347 U.S. 989, 74 S.Ct. 852, 98 L.Ed. 1123 and 348 U.S. 855, 75 S.Ct. 78, 99 L.Ed. 673, reh. den. 348 U.S. 852, 75 S.Ct. 19, 99 L.Ed. 671.

In Pressteel Co. v. Halo Lighting Products, Inc., 9 Cir. 1963, 314 F.2d 695 at 698, we said:

"The test of invention is, as set forth in the case of Cuno Engineering Corp. v. Automatic Devices Corp., 1941, 314 U.S. 84, at pages 89 and 90 [62 S.Ct. 37, 86 L.Ed. 58]:

"'* * * [that] more must be done than to utilize the skill of the art in bringing old tools into new combinations (cases cited). * * * We may concede that the functions performed by Mead's combination were new and useful. But that does not necessarily make the device patentable. * * * [T]he device must not only be "new and useful," it must also be an "invention" or "discovery."'"

to be prior art—which anticipated appellant's claimed invention.

Findings 20 to 26 made by the court below read as follows:

"20. Plaintiff was limited to a date of alleged invention of May 6, 1954 for Patent No. 2,896,938 in suit and a date of alleged invention of September 30, 1954 for Patent No. 2,912,235 in suit, i. e. the filing dates of said patents, since plaintiff failed to provide evidence of any earlier dates. Defendant produced clear and convincing proof that prior to these dates a device embodying the alleged invention of said patents was known and used in this country by Fred E. Knoedler and Harry Richard Knoedler both of Streator, Illinois. Additionally, the alleged invention of Claim 14 of Patent No. 2,912,235 was known and used in this country by John D. Truedson now of Phoenix, Arizona. Fred E. Knoedler constructed several pairs of so-called 'Hydro Shock' booster springs as early as the Spring of 1953. These devices included a tubular shock absorber surrounded by a coil spring, with a rubber sleeve carried by the shock absorber and interposed between the shock absorber and the spring to resist lateral movement of said spring and prevent metal-to-metal contact and noise. Such Hydro Shock devices would have infringed Claims 2, 3 and 4 of Patent No. 2,896,938 if said devices were made after said patent issued. A pair of these Hydro Shock booster spring devices were mounted in a 'sea-legs' fashion on the rear suspension of a 1949 Packard automobile owned by Fred E. Knoedler in the Spring of 1953. When so installed the assembly of said Hydro Shock devices on the rear suspension of this automobile would have infringed Claim 14 of Patent No. 2,912,235 if such assembly had been made after said patent issued. Hydro Shock devices operated satisfactorily and proved to be practical in supporting the rear end of the Fred E. Knoedler automobile whereon they were installed.

"21. A pair of similar Hydro Shock booster springs made by Fred E. Knoedler and incorporating a rubber or plastic sleeve around the shock absorber were installed on the 1949 Chevrolet of Harry Richard Knoedler in a 'sea-leg' fashion during the Summer or Fall of 1953. John D. Truedson installed a pair of the Fred E. Knoedler Hydro Shock booster springs on his 1951 Oldsmobile in about August of 1953. It was not clear that Truedson's Hydro Shock booster springs included a rubber sleeve. However, it was clearly established that the shock absorbers on Truedson's automobile were mounted in a sea-leg fashion and were encircled by a coil spring. The Hydro Shock devices installed on the automobiles of Harry Richard Knoedler and John D. Truedson operated satisfactorily.

"22. No attempt was made to keep the Knoedler Hydro Shock booster spring devices secret. These devices as installed on the 1949 Packard of Fred E. Knoedler were shown to members of the public including employees of Knoedler Manufacturers, Inc. of Streator, Illinois, employees of Beckman Motor Company of Streator, Illinois and the manager of Sig Automotive Parts, Streator, Illinois. Additionally, Knoedler Manufacturers, Inc. advertising (Exhibit AF and Exhibit AG) clearly disclosing the construction of the Hydro Shock booster springs and the sea-leg mounting thereof on the rear suspension of an automobile was sent out to various automotive parts distributors in the Fall of 1953.

"23. Fred E. Knoedler filed U. S. Patent Application No. 377,880 on September 1, 1953 (Exhibit AL), which application was later forfeited. This application discloses the

Hydro Shock booster spring in detail and includes all of the elements which make up the aggregation of Claims 2, 3 and 4 of Patent No. 2,896,938. Figure 1 of this patent application shows the Knoedler device mounted in a 'sea-leg' position on the rear suspension system of an automobile. Hence, the disclosure of this application fully corroborates the other evidence relative to the construction of the Hydro Shock booster spring devices and the mounting thereof in a 'sea-leg' fashion on an automobile rear suspension.

"24. The knowledge and use of the Fred E. Knoedler Hydro Shock device by others in this country prior to the alleged dates of invention of both patents in suit was clearly established by the evidence. Accordingly, said Knoedler device is a complete anticipation of Claims 2, 3 and 4 of Patent No. 2,896,938 and Claim 14 of Patent No. 2,912,235 under the provisions of 35 U.S.C. § 102(a).

"25. Knoedler Manufacturers, Inc. commencing with the Fall of 1953 attempted to market the Hydro Shock device. This attempt was unsuccessful because it was not possible to obtain shock absorbers at a reasonable price and because the Hydro Shock device was outside the farm equipment field in which Knoedler Manufacturers, Inc. was working. It was clearly established that the Hydro Shock devices used by Fred E. Knoedler, Harry Richard Knoedler and John D. Truedson operated satisfactorily and proved effective in supporting the rear end of a heavily loaded automobile. The design of the first Hydro Shock devices was not frozen and Fred E. Knoedler later developed a second type of device utilizing a coil spring that was clamped to the opposite ends of a shock absorber, but not utilizing a rubber sleeve. The Knoedler Hydro Shock device was reduced to practice and it was not an abandoned experiment.

"26. Within the week preceding August 22, 1953 John D. Truedson sold his 1951 Oldsmobile with the pair of Hydro Shock devices still mounted in a 'sea leg' fashion around the rear shock absorbers thereof. Truedson's automobile was sold to Jacobson Trailer Sales in Fergus Falls, Minnesota. Since this sale was made more than one year prior to the date of filing of Patent No. 2,912,235, i. e. September 30, 1954, Claim 14 of said patent is invalid in accordance with the provisions of 35 U.S.C. 102(b)." (Clk's Tr. pp. 93–96.)

We need not analyze in great detail the conflicting claims of appellant and appellee as to what the evidence is in the record with respect to the Knoedler and Truedson shock devices. Knoedler, for example, testified he used Exhibit AT in 1953, including the rubber sleeve. His testimony was corroborated by his two sons, by his patent application (Ex. AL), his drawings, his catalog sheet (Ex. AF) and his price sheet (Ex. AG). Photographs of these "shocks," with attachment in "sea-leg" fashion, were taken prior to August 7, 1953. There is evidence of installation and public use of these shocks in 1953. According to appellee's argument, five sets of the Knoedler shocks were installed *prior* to the filing of the application for patents '938 and '235.

 Appellant urges upon us that much of this evidence was untrustworthy and not possible of belief. That is argument better made to the district court than to us. Conceding that the evidence to support invention and public use was not uncontradicted;—concede that there existed, for example, "strong evidence that the Robertson units could not have been made before 1956,"—and even conceding that a different result could have been arrived at by the district court, does not solve our problem. It cannot aid us in reversing the trial court's findings. The

court's conclusions on disputed issues of fact are binding on us, unless we find them clearly erroneous. This, on the record before us, we cannot do.

### IV

Nor does appellant's theory of the "abandonment" of Knoedler's combination devices require reversal. Cf. Corona Cord Tire Co. v. Dovan Chemical Corp., 1928, 276 U.S. 358, 48 S.Ct. 380, 72 L.Ed. 610; Brush v. Condit, 1899, 132 U.S. 39, 10 S.Ct. 1, 33 L.Ed. 251; Egbert v. Lippmann, 1881, 104 U.S. 333, 26 L.Ed. 755. And there was also evidence of a sale of the Knoedler device (Finding 26). 35 U.S.C. § 102(b).

### V

We find and hold the district court's findings of fact are supported by the evidence, are not clearly erroneous, and that it correctly applied the law.

We affirm.