SCHAEFER, INC., Appellee,

v.

MOHAWK CABINET CO., INC., Appellant.

No. 203, Docket 25923.

United States Court of Appeals Second Circuit.

Argued Feb. 10, 1960.

Decided March 17, 1960.

---

George T. Mobille, Washington, D. C., Ferris, Hughes, Dorrance & Groben, Utica, N. Y., for Mohawk Cabinet Co., Inc., defendant-appellant, C. Willard Hayes (of Cushman, Darby & Cushman, Washington, D. C., of counsel), for appellant.

John Gould, Minneapolis, Minn., Kernan & Kernan, Utica, N. Y., for plaintiff-appellee, Merchant & Merchant, Minneapolis, Minn., Morris Kirschstein, Kirschstein, Kirschstein & Ottinger, New York City, of counsel, for appellee.

Before HAND and MOORE, Circuit Judges, and SMITH, District Judge.

HAND, Circuit Judge.

This is an appeal by the defendant from a judgment of Judge Brennan in the Northern District of New York in an action to declare invalid United States Patent, No. 2,750,758. The defendant, Mohawk Cabinet Company, to which Hoye, the patentee, had assigned the patent, answered and interposed a counterclaim for infringement. The judgment declared the patent invalid, and dismissed the counterclaim on the merits. The patent was issued in June 1956 upon an application filed on July 12, 1954, and was for "an automatically defrosted refrigerated display cabinet having an open chamber for displaying ice cream and other products which must be maintained at sub-zero temperatures." The specifications recite that in such "cabinets" it had been the practice "to divide the chamber into bins for receiving the products" by means of "evaporator plates" which were "in close proximity" to the products. "Since deposits of frost act as an insulator on the plates," these deposits limited their efficiency in refrigeration and were unsightly. Hence it had been the "practice to operate such cabinets continuously and to remove frost deposits by scraping the plates periodically" which is expensive and dilatory.

The Hoye cabinet is composed of two communicating chambers, one above the other. The lower chamber receives the products; it has a glass front through which customers see them, and an open top through which they may take them out: it is the "display chamber." From its rear a passage leads to the upper chamber in which the chief cooling mechanism is located: an "evaporator coil." "Evaporator coils," also run around the outside of the "display chamber," and contribute in some degree to cool its interior, but the "primary" cooling mechanism is the "evaporator coil, 22, preferably of the plate type" in the uper chamber which "is maintained at a lower temperature than the evaporator coils 20 (approximately 16° to 20° F. differential), so as to establish a convectional circulation of air between the lower and the upper chambers." Since the air in the lower chamber is warmer than that in the upper, it will ascend from the lower and will deposit its moisture in the upper in the form of frost. Thence, as cooled air relieved of moisture, it descends through a separate passage back to the "display" chamber. This combination insures a constant flow of cool air into the rear of the "display" chamber, refrigerating the foods in that chamber without creating any substantial frost on its sides. The third element of the combination is wires, running around the top of the "display" chamber, whose function is "to provide a blanket of warm air therein which tends to reduce air circulation in and out of chamber, 14" (the "display" chamber), and also to "maintain the por-

tion adjacent to the open top comfortable to the touch and prevent condensation on the window, 80," in the front of the "display" chamber.

The cabinet was first marketed in 1952 and by 1956 had reached annual sales of nearly three and a half million dollars. The question is, whether it was more than an obvious variant of earlier open "display" refrigeration cabinets already in the art. Three earlier patents disclosed a circulation of air from an open "display" chamber to a colder cooling chamber and back to the "display" chamber. These were Davis, No. 2,444,593; Rutishauser, No. 2,479,135; and MacMaster No. 2,447,759, all granted between July, 1948 and August, 1949, the latest being therefore five years before Hoye's filing date. In Davis, the earliest of the three, the "display" chamber was equipped with "a series of plate type cooling coils" that divided the chamber into bins. However, that was not the only form, for the specifications (col. 6, lines 19–24) declared: "The plate coils are filled with an eutectic" (easily meltable) "solution which freezes at low temperature, whereby the plates remain cold over a long period of time; and the plate coils may constitute the partition and/or main walls of the food display chamber." The defendant seeks to escape this anticipation of a "display" chamber not divided into bins, because Davis' specifications do not declare that the "fin coil" in the upper chamber is "primary" in comparison with the "plate coils," if used, not as "partitions, but as "walls" of the "display" chamber. However, the cabinet is intended to operate by the air in the lower chamber rising into the upper, which inevitably presupposes that the air in the upper chamber will be cooled to a lower temperature than that in the lower. That necessarily makes the upper chamber the "primary" cooling chamber even when plates are put in the lower chamber, and a fortiori when they are used as "walls" of that chamber.

Rutishauser adds nothing to this feature of Davis, for it does not suggest the elimination of "plate type refrigerating coils" from the body of the "display" chamber; but MacMaster discloses a cabinet made of a lower "display" chamber in which an upper chamber is clearly the "primary" cooling chamber. Indeed the main arrangement is to have no cooling whatever take place in the "display" chamber, for the specifications (col. 4, lines 47–52) declare that in some instances it was found "desirable to supplement the refrigerating coil by providing a second cooling coil, 50, located adjacent to the bottom of the display space beneath the shelf, 14. However for most purposes such a supplementary coil is not necessary." In the face of this language there can be no question that this "second cooling coil" is not "primary," and if the "shelf, 14," had been solid instead of being "perforated" MacMaster would have been a complete anticipation of Hoye's combination of upper and lower chambers, for the "shelf" would to all intents then have been a wall of the "display" chamber. Indeed, even as disclosed a part of the refrigerated air passes directly from the descending duct, 26, through openings, 30, in the "lower portion of the baffle, 28" (col. 3, lines 30, 31). The only difference is that the greater part of the air passes first into the lower chamber.

We have hitherto omitted all reference to Hoye's third element—"the resistance wires 78," which run around the top of the "display" chamber. The patent to Rutishauser that we have already mentioned and that to Brinkoeter No. 2,483,804 both disclose heating wires running along the top of a part of the "display" chamber to prevent condensation on mirrors in the chamber, but in neither case does the wiring go around all four sides. Hargrave, a witness for the plaintiff said that the purpose of these was also to warm the top railing to the touch; but nothing in the prior art shows that such wiring was meant to reduce the circulation of air in and out "of the display" chamber, which was apparently the chief purpose of the wires in the Hoye cabinet (col. 4, lines 27–29). The difficulty is that Judge Bren-

nan found that, although the wires did help to keep the air from condensing and warmed the upper edge of the chamber they were "a detriment rather than a help in the refrigerating process," and the evidence was such that we may not hold this finding "clearly erroneous." On the contrary, Jordan, a witness for the plaintiff, testified that it required a "somewhat greater" refrigeration "if you had anti-sweat heaters on than if you didn't," and Hargrave thought that such wires were useful only to prevent condensation and to warm the edge of the chamber. The testimony of the defendant's witness, Galson, does not seem to us to contribute any enlightenment to this issue. Since the wires have a purpose—to prevent condensation—for which they were used in earlier patents, it was not invention to run them all the way around, for that was merely a minor matter of designing. Had they in fact performed the other function attributed them, more could be said in favor of them as invention, but not upon this record, for to be patentable an invention must be "useful," and so far as they are not, they cannot count.

■■■ We conclude therefore that the tripartite combination of the Hoye disclosure was not for a patentable invention, the first two elements having been combined in the art before, and the third contributing nothing new that was useful. Apparently beginning in the 1940s there had been a large demand for cabinets of this sort; at least the art abounded in them. In appearance and reliability the Hoye cabinet may have excelled the others; it may also have been marketed with unusual skill and by an especially competent manufacturer. But there was nothing that we can discern in the variants disclosed that demanded more than good standard craftsmanship and that distinguished it from what had gone before. We agree that Lyon v. Bausch & Lomb Optical Co., 2 Cir., 224 F.2d 530 has restored the original test of invention, and we seek to apply no other; but it has never been the law that commercial success is alone a sufficient standard of invention. Hoye's additions and departures appear to us to be no more than changes within the competence of a skilled workman. The precedents which antedate the Bausch & Lomb decision are not necessarily to be disregarded. For example, Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162, requiring closer scrutiny of combination patents, seems most felicitous here. This scrutiny amounts to nothing more than a common-sense appraisal: where a particular aggregation of recognized elements produces something novel, it is patentable; where it merely embellishes one of the ingredient elements, it is not. We agree that that standard is always subjective, the creature of an imagination projected upon the future out of materials of the past. The law is full of such standards, without which we should again and again be throttled by an infinity of prescriptions. The best we can do is to set forth in detail the reasons which appear, not only to justify, but to demand, our conclusion.

Judgment affirmed.