**GENERAL BRONZE CORPORATION**
and Quick Mount Manufacturing
Co. Inc., Plaintiffs,

v.

**WARD PRODUCTS CORPORATION** and
Joseph B. Cejka, Defendants.

Civ. No. 8048.

United States District Court
N. D. New York.

Nov. 7, 1966.

Curtis, Morris & Safford, New York City, for plaintiffs. Whalen, McNamee, Creble & Nichols, David S. Williams, Albany, N. Y., Daniel L. Morris, John A. Mitchell, New York City, of counsel.

Davis, Hoxie, Faithfull & Hapgood, New York City, for defendants. De-Graff, Foy, Conway & Holt-Harris, Albany, N. Y., William E. Dampier, George E. Faithfull, New York City, of counsel.

JAMES T. FOLEY, Chief Judge.

*Opinion, Findings of Fact & Conclusions of Law*

This action involves automobile antennas familiar outwardly as the slim, bright metal rod mounted on automobiles in different places so the radio in the car can be tuned in for the enlightenment and entertainment of the occupants. To the majority of automobile owners that have such optional extra I would venture not many would have any more knowledge of this mechanical and electrical device than this Court had before beginning the trial of this litigation and the trying experience to fit the facts of extensive and minutely controverted proof together to arrive at fairly intelligible expression of decision. Together with the usual complexity of patent validity and infringement dispute, we have the added feature of unfair competition charge based upon strongly worded statements in trial record and briefing for plaintiffs of deliberate piracy and purloining of a trade secret by a highly placed former employee. The cloak and dagger overtones in this respect joined with the technological aspects might require training and experience in detective work as well as the scientific field for good evaluation.

Justice Frankfurter wrote in Marconi Wireless Telegraph Co. of America v. United States, 320 U.S. 1, 60, 63 S.Ct. 1393, 87 L.Ed. 1731, that it is an old observation that the training of Anglo-American judges ill fits them to discharge the duties cast upon them by patent legislation. Although not a complete novice in patent litigation, the prolonged deliberation I found necessary in this instance—interfered with often by the pressures of the routine court work, the nature of much of this in this federal district being undeferrable—brought home the truth of this old observation and the senselessness by federal judges untrained in the patent art to pretend otherwise. (See "Special Judges For Patent Cases?", by Emanuel R. Posnack, Vol. 50, Am. Bar Assoc. Jour., May 1964; Nyyssonen v. Bendix Corp., 137 U.S.P.Q.

853, 860; Telechron, Inc. and General Electric Co. v. Parissi, D.C., 120 F.Supp. 235, aff'd 2 Cir., 229 F.2d 440; Vermont Structural Slate Co. v. Tatko Bros. Slate Co., Inc., D.C., 134 F.Supp. 4, aff'd 2 Cir., 233 F.2d 9, cert. den. 352 U.S. 917, 77 S.Ct. 216, 1 L.Ed.2d 123).

The presentation at the week-long trial and submission of delayed but substantial briefing have been superbly done by specialized practitioners in the patent field. There is no cause for complaint regarding their painstaking effort to simplify and clarify the issues for the Court. At the trial approximately 35 physical exhibits were introduced in evidence that include models of development, actual automobile antennas sold over a period of years, and several specimens of well-known metal objects assembled at the trial scene before me for demonstrative purposes, 56 plaintiffs' documentary exhibits and 32 defense exhibits of that type. The result was a trial record— and it is a good one—of about 774 pages, and depositions of various witnesses numbering 765 pages that were introduced and marked in evidence without much reference to them at the trial. An array of different personalities, many of them skillful mechanics, experts, artisans, developers and producers in this precise art by their testimony crossed the scene to testify about their knowledge of events during the long period of time from which the pertinent facts arose.

There are corporate changes and predecessor companies, subsidiary companies and divisions of companies over the years involved that make necessary their exact identification in order to keep straight the part each plays in relation to the claims and the defenses in depth asserted. The arguments and counter-arguments concerning the facts and inferences to be drawn therefrom seem, in my opinion, to touch upon every possible facet of breach of trust and unfair competition, and patent law. At times the factors to be weighed in relation to alleged trade secret violation and the two separate patents in issue do seem to merge and mesh into each other to the extent confusion may result. I shall try to clarify and departmentalize the evidence as I view it in relation to claims that must be kept separate. There is dispute on the facts and law that astute and experienced patent lawyers on the patent aspects, as expected, argue down to microscopic differences at times concerning these relatively small and compact mechanical and electrical devices used without much thought of complexity by the ordinary motorist for reception of radio signals in automobiles.

I

*The Parties and Issues*

General Bronze Corporation and Quick Mount Manufacturing Co. Inc. are New York ones. General Bronze had a wholly owned automobile antenna subsidiary, Brach Manufacturing Company of Newark, New Jersey. It was for this subsidiary corporation of General Bronze that defendant Joseph B. Cejka, an important figure in the litigation, was a Vice President and General Manager active and in charge of design, development and sale of products by Brach. Defendant Cejka had this responsibility for approximately ten years before he left General Bronze in November, 1957. Previous to that he had discharged about the same duties together with those of consultant for several years with L. S. Brach Company, predecessor of General Bronze, being a company likewise engaged in the design, manufacture and sale of automobile antennas.

When Cejka left General Bronze in 1957 he became General Manager of the Ward Products Division of the Gabriel Company, an Ohio company with its principal office in Cleveland, Ohio. The defendant Ward Products Corporation was chartered in New York in April, 1959, and on May 1, 1959 acquired all the assets and business of the Ward Products Division of Gabriel in Ohio. The principal office and place of business of defendant Ward Products Corporation was moved to and is now at Amsterdam, New York, and it is undisputed defendant

Cejka is in control of the new corporation. It is against Cejka and the company he controls the unfair competition and breach of confidence charge of the original complaint filed April 4, 1960, is laid in behalf of both plaintiffs. Substantial money damages, injunction and attorneys' fees are sought in this unfair competition claim.

In the patent count, an amended complaint reduced the number of patents in issue to two. Both were applied for and issued to Joseph Grashow of Brooklyn, New York. The first is Patent No. 2,509,563, application for filed March 3, 1948, issued May 30, 1950, subject: Automobile Antenna. The second is Patent No. 2,917,743, filed for February 21, 1957, issued December 15, 1959, subject: Automobile Antenna Apparatus (Pl. Ex. 3). Plaintiff Quick Mount Manufacturing Co. (Quick Mount) is the owner of the patents by assignment. In April, 1960, when the original complaint was first filed—and thereafter it should be noted pretrial activity in various phases extended over a period of more than four years—Plaintiff General Bronze by agreement with Quick Mount was an exclusive licensee under the patents but is now a non-exclusive licensee. These plaintiffs have their own private quarrel about payment of royalties on several antennas concerning their adaptability for top mounting, but that disagreement is of little concern here. The defendants have counterclaimed for a declaratory judgment that the named patents are invalid and not infringed. The particular defenses to Patent 2,509,563 are: (1) lack of invention; (2) non-infringement in regard to defendants' free-floating slidable rocker; in the alternative lack of novelty if such device is held as infringement; and (3) laches and estoppel. To Patent 2,917,743 the defenses are lack of invention and novelty. The defense in the unfair competition claim is that the specified small parts assembly developed and added to the so-called top mount disappearing antenna of Brach in 1957 were not secret at all, and also were known to the public independently for similar and obvious uses and purposes they served on the antenna.

## II

### The Unfair Competition Claim

The evidence in respect to this serious and unpleasant charge, the second cause of action in the amended complaint, must be separated from that to be weighed in relation to the patent issues. This task is not too easy because there is an overlapping and spilling over in the proof and the legal arguments addressed to such from one phase of this claim into the other patent one. The lawyers agree by cautioning in their briefing several times the ease with which confusion can be created. The plaintiffs' counsel mince no words in strong statement that attempt I think at times to wrap together for consideration on the varied claims the alleged derelictions of the defendants. It is that defendants, Cejka and Ward, after Cejka left the employ of Brach in November 1957, not only pirated the unpatented cap-cork-pad electrical combination claimed to have been developed by employees of Brach in confidence and secret in 1956–1957, but also that Cejka and Ward when they manufactured and sold their "top mount disappearing" antennas in 1958 deliberately also used the patent combination of the "top mount disappearing" antenna as claimed in the Grashow second patent 2,917,743, (Pl. Ex. 3), and additionally used the "top mount cowl" antenna features covered by the first Grashow patent, 2,509,563, (Pl. Ex. 1). It is a three-pronged attack against single antenna devices that possess little difference in their form.

The events to be searched out in this unfair competition claim are those that touch the routine of the alleged confidential and secret development of a very limited portion of the antenna assembly that took place at Brach in the 1950's. Further, the search must be to determine whether the particular confidential information or trade secret alleged in this circumscribed portion of the assembly elements of antennas as finally developed was carried as such by Cejka to his new

company, Ward, in violation of his pledged obligations to General Bronze and its subsidiary, Brach. There is a myriad of legal principles to be applied to the evidence with omissions and gaps in it that give arguability by both sides to surmise and suspicious inferences that are never a good base for legal decision. In my opinion, there is enough clarity in the record of simple fact to permit straightforward fact findings and rational inference.

The contentions in this first claim revolve around efforts by Brach employees in the early 1950's into 1957 to develop a top mount disappearing antenna. It should be noted here that Brach had been manufacturing the so-called cowl top mount antenna under the Grashow patent 2,509,563, pursuant to a license agreement between Quick Mount and General Bronze of April, 1954, (Pl. Ex. 25). This would be stationary and not telescope into the fender well. In this unfair competition and breach of confidence issue there is no need to discuss at this time this first Grashow patent issued in May, 1950, except to indicate the structure under this patent gave the basic structure which the Brach employees used for their experiments and model making that resulted in the mounting of the cap-cork-pad associated parts or electrical connections charged to have been kept secret by Brach for business and economic reasons after being perfected, it is said, to satisfaction in 1957. It is not proven, in my opinion, in any manner what these business and economic reasons were that impelled Brach to keep this cap-cork-pad off the market in 1958 in order to preserve these new features as secret for future use when put in final acceptable form by model maker Mainiero, a figure of importance in this unfair competition problem.

The plaintiffs emphasize and reemphasize business, economic and strategic competitive reasons were the ones the Brach commercial antenna (Pl. Ex. 20) put on the market by Brach in March 1958, after Cejka had left its employ, deliberately lacked the Mainiero cap design developed in 1956–57 (Pl. Ex. 39). This was the cap design later appearing on the defendants' commercial antenna, (Pl. Ex. 19), marketed in October, 1958. My difficulty is I am unable to find persuasive proof to show a corporate decision was so made that must be assumed to have been one of high level importance and consequence for this corporation in this specialized antenna business. To support their contention that this cap-cork-pad configuration was decided to be held in secrecy and confidence and withheld from the market, the plaintiffs point only to the testimony of Chief Engineer Dooner of Brach. (R. 250). This testimony, as I read it, is only that he knew Pl. Exs. 39 and 40, duplicates of each other, were part of a development of the first top mounting disappearing antenna at Brach and that Dooner recently (1964) before the trial turned them over to the Chief Counsel for Plaintiffs after he located them at that late date locked up in steel boxes in the electrical laboratory of Brach. This substantial time period when these two models, claimed to have secret and confidential assembly additions, were seemingly forgotten and cast aside, or at least not important enough to stimulate search for them for many years, weakens considerably, in my judgment, any contention that at the time of their development and perfection there was recognition by those concerned that secrecy and confidence and care in handling should be attached. There are no corporate records produced of any kind from General Bronze or Brach in relation to the existence and location of these models or to indicate the business and economic corporate reasons to withhold the improvement from a highly competitive market in order to preserve their secrecy for future use. The sample report tagging and identifying procedures apparently followed in the regular course of development in the antenna business was not done with these two models. (R. 713–715).

There is no doubt defendant Cejka, as Vice President of Brach during the period of interest here, held a responsible

and trustworthy position, being in charge as a qualified and experienced engineer of the development and experimental work of that concern. It is true also that together with the obligation implied by law in contracts of employment not to use confidential information acquired during employment in competition with the previous employer, there is present also the express employment agreement of Cejka with General Bronze in 1949 that he would keep forever confidential any information acquired during his employment. (Pl. Ex. 46; See Byrne v. Barrett, 268 N.Y. 199, 206–207, 197 N.E. 217, 100 A.L.R. 680; Kaumagraph Company v. Stampagraph Co., Inc., 235 N.Y. 1, 138 N.E. 485; L. M. Rabinowitz & Co., Inc. v. Dasher, Sup., 82 N.Y.S.2d 431; 78 P.Q. 163). These are difficult principles to apply factually when the quick glimpse gives a picture of Cejka leaving General Bronze/Brach in November 1957, then coming on the market in October 1958, with a new device (Pl. Ex. 19) manufactured and marketed by his own new company Ward that at least, without question, does have similar configuration to the Mainiero cap design (Pl. Ex. 39) with which development he was intimately connected. It also appears from physical exhibits and photographs that, as claimed, Brach in March 1958 did not include the saddle-like cap and cork pad of the Mainiero model (Pl. Ex. 39), but used a long, tubular, one-piece head to clamp. (Pl. Ex. 20).

These facts, of course, must be accepted as ones with good arguable support on their face, producing reasonable and justifiable suspicion that a piracy of an idea in company development was perpetrated. However, it is my opinion on this question of substance that an analysis in depth portrays significant factors in the evidence sufficient to counteract and absolve from this conclusion of suspicion, natural at first glance, and at least compel ruling of failure of proof in that there is a balancing or counterbalancing fatal to plaintiffs' second cause of action under the traditional legal burden of proof imposed upon the plaintiffs in this type claim. There are many unanswered questions in the proof. Finding and concluding otherwise than so described would, in my judgment, have to be based upon much conjecture and suspicion to reach the serious conclusion of deliberate breach of trust and confidence by defendant Cejka.

There also has been a disturbing shift of position by plaintiffs throughout the trial and in the briefing from the averments of the complaint and pretrial answers to interrogatories, concerning the exact elements of the alleged Mainiero secret combination defendant Cejka is claimed to have imparted with breach of confidence to Ward. Throughout the excellent briefs of plaintiffs we have reference at times in this respect with varied terminology to:—the cap-cork-pad; the cap and cork pad construction; cap-cork-pad associated parts; the cap, cork pad and electrical connections. In the trial record, as the defendant argues, the stress seems to be by the plaintiffs upon the cap alone as the trade secret that Cejka took with him to Ward. (R. 186, 306, 640). No position could be more clearly and precisely stated in several places. This is important also when related to an answer to an interrogatory in August 1962, stating that the confidential information, trade secrets and know-how which Cejka acquired from General Bronze was embodied in a wide range of documents, without identification, among them engineering drawings, specifications and a large volume of correspondence and memoranda. At least the inference is that Cejka took much besides the missing two specimens or models, Pl. Exs. 39–40. I accept as truthful answer to these charges the testimony of Chief Draftsman Migatz of Brach,—chiefly responsible and in a position to know,—that he knew of no taking of samples, records or anything else from the Engineering Department by Cejka before, during or after he left the employ of General Bronze. (R. 702–705). In answer to an interrogatory filed March 27, 1963, the plaintiffs limited the trade

secret allegedly taken as exemplified in Pl. Exs. 39–40 to the features disclosed and/or claimed in U.S. Patent No. 2,917,-743 (Pl. Ex. 3) in suit.

The electrical connections and construction of these models, described vaguely several times as associated parts, seem to be added at times to the cap-cork-pad trade secret and confidence charge of violation. Director of Engineering for Brach since 1950, Dooner, casts grave doubt upon the contention that the electrical connections to complete the workability of the antenna with the car radio was secret. Such electrical connections as shown in figs. 5–6 of Pat. 2,917,743 he seems to say were used on the 1958 commercial model CV-250 of Brach (Pl. Ex. 20) placed on sale in March, 1958, and definitely not secret. (Def. Ex. AA pgs. 51–57). In my judgment, we are down really for consideration to the cap-cork-pad combination as an alleged trade secret. As defendants point out, it is doubtful if a cork pad is on the models Pl. Exs. 39–40, and in any event it is questionable whether such simple accepted method known for years to clamp for rigidity and insulation can be considered secret or confidential at all.

To center now attention on the cap, I have already indicated doubt or at least failure of proof about the aura of secrecy surrounding any of the elements characterized secret by reason of the casualness in retention and custody of the models. There are other specifics in the evidence I relate now that bolster further the lack of secrecy necessary for breach of confidence. Mainiero, the model maker, made four specimens of the experimental and development model and Pl. Exs. 39–40 are two of such four. There is evidence, handwritten long entries of Mainiero, which have a solid ring of integrity, and lead through the steps of discussion, development and final assembly of the models. (Pl. Exs. 44A, B, C, 45A). These records preserved from long ago trace a beginning from October 13, 1956, and have significant entry, October 22, 1956, that Cejka liked

the idea, modified it a bit, and Mainiero would start to make up one. There is entry in Ex. 45A that there was a three-hour discussion of the assembly with Cejka, Ed Grashow (brother of Joseph the inventor), Dooner and Migatz. Two of the models were produced at the trial and trial strategy seemed to prevail and there apparently was fear by both sides to ask Cejka directly if he retained the other two models. I am not sure it makes much difference because surely Cejka could carry in his trained, engineering mind, a simple cap configuration without keeping covertly models of it. There is confusion about the caps. Mainiero testified he made at least seven caps and maybe more. (R. 293, 295). Four of the caps went into the mock-up and, of course, three would be left, assuming only seven were made. Only two were produced at the trial. There is vagueness by Mainiero in regard to the disposition of other caps and the number of others he might have made. (R. 295–296). This is one of the omissions and uncertainties in proof mentioned previously as substantial enough in my opinion to cause hesitation to find there was no showing to the customers of Brach of these caps, and even the complete assembly.

Together with the lack of atmosphere I find concerning secrecy and confidence in relation to this cap-cork-pad configuration, there is other evidence to demonstrate common knowledge of such fastener was long known in the electrical industry. Caps and clamps of this nature to fasten and make rigid the coaxial cable on electrical leads and wiring to protect the electrical connections were known long prior to 1957 and used on small motors. (R. 630–1; 642; See Def. Exs. T, U). Exhibit U demonstrates a wall plate fitting or clamp, and T is an instruction catalogue (1951) showing in my judgment enough to dissolve any secrecy aspect concerning clamps or fasteners for electric wiring. I found Cejka believable and accept his testimony that a cap used as a fastener for coaxial cable could be of a dozen kinds of a stamping or

casting. (R. 188). The confidentiality of the model room area was proven to some degree, but the absences of Mainiero for long periods and the entrance of many merchandising customers did not cloak it in my opinion with the military security the witness Kamen seemed to feel was present and comparable. (R. 291-2, 693, 549-50, 335-7).

In my opinion, enough has been said concerning my analysis on this phase. Chiefly, I find no trade secret or confidence or atmosphere of such related by anyone to the specific assembly of a cap-cork-pad. My inference is that the assembly of the cap and cork pad to which Cejka contributed thought and modified came to him as a result of engineering education and experience. Surely, engineering would be a sterile field for progress if knowledge 'of simple clamps and fasteners were to be characterized secret and to be outlawed from use as a betrayal of confidence if one went to other employment. The subject matter of a trade secret must be secret. (Restatement of Torts, (1939) Vol. 4, pg. 5). There is no betrayal of confidence when there is no secret imparted. (Kaumagraph Company v. Stampagraph Co., Inc., supra, 235 N.Y. at pg. 9, 138 N.E. 485). I feel Franke v. Wiltschek, 2 Cir., 209 F.2d 493, relied on by plaintiffs, had an unusual factual situation. The conclusion in that case that knowledge was not shown to have been gained from public sale or unexpired patent by the defense does not apply here because I find the clamp in the public domain as well as the domain of engineering or electrical knowledge for years and known to customers of Brach before Cejka left its employ. (See Skoog v. McCray Refrigerator Co., 7 Cir., 211 F.2d 254, 257).

My findings of fact are contained in this section of this opinion on the unfair competition claim, the second cause of action. I conclude it must be dismissed for failure of proof.

## III

### Patent No. 2,509,563 (Pl. Ex. 1)

The question I place first and shall discuss as a threshold one in relation to this first patent of Grashow issued in May 1950, is the defense of laches and estoppel not too common a defense in patent litigation. Discussion of this defense first is inverse to its order as asserted and discussed by the defendants. The defendants place it third in line of defenses in depth for consideration after lack of invention, the primary defense, and secondly non-infringement by defendants' devices, or alternatively, lack of novelty if they do infringe. The defendants by this relegation do not minimize its worth but strongly urge that under the facts present we have a classic or textbook set of circumstances for application of these equitable doctrines.

I feel there is strength in this contention and the issues of this defense are close factually and legally. Just to count the years from 1950 to 1960 with no suit for infringement against anyone manufacturing similar automobile radio equipment, and particularly not against defendants' predecessor Gabriel Ward during that long period imparts a strong degree of persuasion that the case law relied on by the defendants should apply. (See Lukens Steel Co. v. American Locomotive Co., 2 Cir., 197 F.2d 939, 940; Ferroline Corp. v. General Aniline & Film Corp., 7 Cir., 207 F.2d 912, 924; Young v. General Electric Co. (N.D. Ill.), 96 F.Supp. 109, 139-140; Gillons v. Shell Co., 9 Cir., 86 F.2d 600, 608; Rome Grader & Machinery Corporation v. J. D. Adams Mfg. Co., 7 Cir., 135 F.2d 617, 619-620; Brown v. County of Buena Vista, 95 U.S. 157, 161, 24 L.Ed. 422, some of the representative cases cited). However, due to the decisive determination I hereinafter make on the substantial and primary defense of lack of invention regarding this first patent, findings and a conclusive adjudication that would only be a bar to and disentitle plaintiffs to a judgment of infringement even if invention were found seems un-

necessary to render. The same reasoning applies to the withholding of decision on the non-infringement or lack of novelty defense if the devices of defendants were found to infringe.

Such viewpoint is not expressed to infer that the lack of invention issue is so simple and clear-cut as to present a problem of little consequence that quickly is the evident solution to the others. To the contrary, in relation to this first patent, in my opinion, the issue of lack of invention needs careful analysis and requires a substantial discussion. I think this approach to forego and withhold decision on the other defenses will best serve the interests of justice. If I am in error on the dominant issue of lack of invention, appellate wisdom may point the way to speedy resolution of the two dependent defenses. As Learned Hand wrote, invention, when Judges had to seek legally its presence, became the most baffling concept in the whole catalogue of judicial efforts, and in another patent case he noted the test laid down to decide obviousness is indeed misty enough. (Lyon v. Bausch & Lomb Optical Co., 2 Cir., 224 F.2d 530; Reiner v. I. Leon Co., Inc., 2 Cir., 285 F.2d 501, 503–504, cert. den. 366 U.S. 929, 81 S.Ct. 1649, 6 L.Ed.2d 388. See also Harries v. Air King Products Co. Inc., 2 Cir., 183 F.2d 158, 162). Since the trial and submission in this action we have had the one great benefit—offered as no excuse for delay for this decision—that current Supreme Court writings have come down in 1966 that enlighten as to many principles in patent case law that had become controversial and cloudy in court application, and particularly clarified the requirement of non-obviousness added by statute in 1952 (35 U.S.C. § 103) to the century-old standards of novelty and utility necessary for patentable invention. (Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545; United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572).

■■■ The Graham case clarified many patent law principles that had become unsteady for court application due to varying viewpoints and distinctions in this complex field of law. To synopsize mainly in my language some of the rulings that are pertinent to the issues and contentions of the parties here:—The non-obviousness statutory requirement was intended to leave unchanged the general level of innovation necessary to sustain patentability. A patent must have novelty, utility and non-obviousness, and the three conditions must be satisfied. Long felt but unsolved needs and the failure of others are secondary considerations that may throw light upon the original of the subject matter sought to be patented. There is a notorious difference between the standards applied by the Patent Office and by the Courts. There is no change in the general strictness with which the overall test to decide patentability must be made. Invention is to be construed not only in the light of claims but also with reference to the file wrapper and prosecution history in the Patent Office. Claims narrowed to obtain a patent cannot cover that previously eliminated. (Graham v. John Deere Co., supra, 383 U.S., pgs. 1, 2, 17, 18, 32, 86 S.Ct. 684).

■■■ A recent elaborate and reasoned interpretation of Graham is found in American Infra-Red Radiant Co. v. Lambert Industries, Inc., 8 Cir., 360 F.2d 977, 984, cert. den. Oct. 24, 1966, 385 U.S. 920, 87 S.Ct. 233, 17 L.Ed.2d 144. This authority asserts in the interpretation of the Supreme Court ruling that the test of obviousness is the only correct test to be applied in determining whether a new combination of known components amounts to invention. Further, the ultimate question of patentability is for the court and the court, when the contrary is shown, is not obliged to yield its judgment to the presumption of validity arising from the patent itself. (at pg. 989). Considerable hesitation, debate and discussion in the Patent Office is significant and may indicate a borderline grant in a crowded art. (pg. 989). Commercial success is not a decisive factor itself in the determination of invention. (pg. 989;

see also Jungersen v. Ostby & Barton Co., 335 U.S. 560, 567, 69 S.Ct. 269, 93 L.Ed. 235; Monroe Auto Equipment Co. v. Superior Industries, Inc., 9 Cir., 332 F.2d 473, 480, cert. den. 379 U.S. 901, 85 S.Ct. 190, 13 L.Ed.2d 175).

 Other principles pertinent to this litigation are: Strong proof is needed to show a patent has been anticipated by unpatented devices. (The Barbed Wire Patent, 143 U.S. 275, 284–285, 12 S.Ct. 450, 36 L.Ed. 161; Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 60, 43 S.Ct. 322, 67 L.Ed. 523). However, the burden, of course, is not an unsuperable obstacle and can be met. (Rooted Hair, Inc. v. Ideal Toy Corp., 2 Cir., 329 F.2d 761, 765). A patentee is protected against the use of equivalents, and a substantial equivalent of a thing, in the sense of the patent law, is the same as the thing itself. (Machine Co. v. Murphy, 97 U.S. 120, 125–126, 24 L.Ed. 935; Parker v. Automatic Machine Co., D.C., 227 F. 449, 452). Contemporaneous documentation of testimony concerning prior public use of similar devices is preferable, but there is no absolute requirement for evidence to take this form. (Dempster Bros., Inc. v. Buffalo Metal Container Corp., 2 Cir., 352 F.2d 420, 423, cert. den. May 16, 1966, 384 U.S. 940, 86 S.Ct. 1458, 16 L.Ed.2d 539).

In commenting on the incentive claimed to be present at times to keep secret inventions while uses are searched out, and cautioning that this position is easily exaggerated, Justice Fortas remarked without any criticism that there is a highly developed art of drafting patent claims so that they disclose as little useful information as possible while broadening the scope of the claim as widely as possible. (Brenner v. Manson, 383 U.S. 519, 534, 86 S.Ct. 1033, 16 L.Ed.2d 69). To my untutored mind in patent practice there is unfortunate consequence that at the same time such magic in expression keeps obscure the vital information the Judge needs to know to adjudge the presence or lack of invention. The claims in issue in this patent have been

reduced to 1–3, 7–9, 11–13 from the thirteen in the patent. (R. 116).

 The patent relates by its heading to an Automobile Antenna. It is stated in the beginning that a feature of the invention is the provision of a simple and inexpensive antenna structure for automobile radio equipment having a single hole mounting which may be fastened in position from the outside of the car. This introduction is encouragingly plain, but later the claims, the crucial wording to be examined, are in the technical language of the patent draftsmanship art, specifying in detail the physical elements of this really small device claimed to accomplish this new feature.

For example, Claim 1 is set forth in this manner:

1. An antenna structure adapted to be secured in an opening in the body of a car which comprises an antenna, a metallic antenna supporting sleeve adapted to be partially inserted in the opening from the upper surface of the car, insulating means for securing an end portion of the antenna in the sleeve in co-axial relation therewith, toggle means carried by the sleeve adapted to pass through the opening when the sleeve is partially inserted therein for engaging the under surface of the car body immediately adjacent the opening and providing a ground connection between the sleeve and car body, and means for exerting a withdrawing force on the sleeve to cause the toggle means to grip the under surface of the car body and thereby secure the sleeve to the car body which comprises a nut threaded on the sleeve outside of the car body.

Another feature of the invention outlined in the patent is its suitability for quick installation on a mass production basis. It is stated that a mounting hole is bored in a suitable location in the car body, such as the cowl or fender, and the flexible conductor and part of the sleeve are thrust through the opening. The sleeve is provided with an arrangement for engaging and gripping the undersurface of the car body when an external

lock is tightened, thus securing the antenna in place. This arrangement eliminates the expensive, time-consuming practice of attaching mounting brackets and other securing devices on the interior of the car body where the worker is almost always handicapped by having to work in cramped quarters. (Col. 1, ls. 9–31, Pl. Ex. 1). It is this topmounting result of the Grashow assembly the plaintiffs emphasize and reemphasize as significant to proclaim the birth of new concept and invention.

The plaintiffs in their brief put the inventive features claimed in this respect more assertively, urging that Grashow brought success out of failure and solved a long-existing problem—that of eliminating mounting from beneath the cowl by providing an antenna that included arms that would swing into general alignment with the supporting sleeve for insertion through a small round drilled hole in the cowl, and which would move into position to grip the undersurface of the cowl to ground the antenna, and when the topmount was tightened to securely fasten the grounded antenna in firm position, regardless of the curvature of the cowl. So the features claimed as novel, useful and inventive are created by limited additions only to hardware of the past, as the lawyers term other parts of the antenna assembly, such as the whip, the threaded sleeve, insulation and spacer. (See Def. Ex. F, R. 589–595).

The contention by plaintiffs is that this Grashow antenna attained an advantageous result never reached by any previous antenna in that this combination itself of elements, even though some elements be old and some new, could be topmounted through a small hole one and three-sixteenths inches in diameter by a simple insertion with the locking means in one position that permitted the locking of the antenna by a simple lifting or pulling-up operation automatically adjusting the locking means, and at the same time grounding the antenna electrically to the body of the automobile.

So it should not be overlooked that this patent is not claimed to be the first to recite the total original invention of the automobile radio antenna but only one that furnished small new assembly additions and combination concept for antenna devices that made topside mounting on automobiles much easier and more secure than the underside mounting of the past. (See Pl. Ex. 49, Finke Pat.—1949; Pl. Ex. 60, Turk Pat.—1955). The inner clamping members and new elements are described broadly in the patent as "swingable means", then narrowed down in the claims to varied descriptions of the clamping members such as "toggle means", "pivoted means" or "pivoted arms". The means, no matter the type or method of support by the claims, are essentially a rockerlike construction of arms, or toggle arrangement of such, that swing into alignment with the supporting sleeve for insertion in the small hole in the cowl to be drawn up to the position wanted after insertion by tightening the nut on the sleeve above. The plaintiffs rely upon a *combination* only of elements, old and new, disclosed as they urge in this particular new assembly, by no single patent or prior use. The *combination,* they contend, accomplished a new and novel result not theretofore accomplished, and such combination solved a long-existent problem at which others had sought solution but failed. (See Leeds & Catlin Co. v. Victor Talking Mach. Co., 213 U.S. 301, 29 S.Ct. 495, 53 L.Ed. 805; Guide v. Desperak, 2 Cir., 249 F.2d 145, 147).

In my judgment this topmounting capacity upon which so much stress is laid as being a contribution important enough to support valid invention is not shown by the evidence, in my opinion, to be an original concept and idea that singularly belonged to Grashow in the automobile antenna art. There is testimony from plaintiffs' expert Kamen about the troubles of the early days in the late 1930's when radio antenna mounting was, as he described it, a pretty filthy job, his experience being limited to side cowl or running board installation. (R. 317–20). Grashow has testified that in the early 1940's some of the antennas were

mounted from the underside to pierce the fender or cowl on installation, taking from ten minutes to a half hour. (Ex. F, pgs. 136, 138, 146). Then the placing of reinforcing plates and supports under fenders and cowls on the post World War II autos, as would be expected, made this underside mounting more difficult. (R. 344–5). Migatz, the Chief Draftsman, said that right from the beginning of his work at Brach from 1945, samples of competition models were kept, and most .of them with a little ingenuity could be topmounted. (R. 706–7). So we had the march of progress in mechanical and electrical skill over a period of years common in the industrial capability and know-how of this country. In my simple way, and this is not meant in depreciation of the valued utility contributed by Grashow in the competitive field, I easily conceive that the apparent difficulties of 1945 in underside mounting triggered the minds of many to the obvious conclusion the best thing to do would be to start thinking how to mount from the top at the place of installation.

Of course, there are other factors not as subjective as that amateurish thought adverse to inventive concept. I believe there is presented persuasively by the defense a substantial question of file wrapper estoppel as regards the two prime ideas and their elements claimed as new to effect a combination claimed as inventive. (See Graham v. John Deere Co., supra, 383 U.S. pgs. 33–34, 86 S.Ct. 684). In the prosecution in the Patent Office—which seems to me an unusual give-and-take proposition but I suppose may be normal procedure—it is clear broad claims were filed by Grashow for patent grant to cover mounting outside the car and a claim for an antenna to have toggle means carried by the sleeve to engage the undersurfacing of the car body. (Def. Ex. V, pg. 6, Claims 1, 2).

The Patent Office Examiner expressly stated the Claim 1 above was unpatentable in view of the fact there was prior art showing of an antenna to be mounted from the exterior of a car with means for undersurface gripping and for the exertion of a withdrawal force from outside the car to secure the gripping means. (Def. Ex. V, pg. 20). Further, and just as important, the Examiner expressly stated the claims, such as Claim 2 calling for the use of toggle means on the sleeve for the inner clamping, were unpatentable because of prior art patents on toggle bolts. (Def. Ex. V, pg. 21). Thereafter, Grashow canceled the broad Claim 1 for exterior mounting, (Def. Ex. V, pg. 23), but did argue the toggle bolt use was in a non-analogous art and being on the market for years should not destroy the inventive concept to resort to them for mounting automobile antennas, such antennas being a recent market development with a different problem. (Def. Ex. V, pg. 25). In answer, the Examiner cited and depended upon the Friedberg patent, 2,473,141 (1947 application granted 1949) as showing the use of a form of toggle as the inner engaging means for outside mounting and rejected Claim 2 and Comparable Claim 4. (Def. Ex. V, pg. 34; Def. Ex. Q, Friedberg Pat. 2,473,141, ls. 1–7). The Examiner did allow claims that expressly limited the part exerting the withdrawal force *as a nut threaded on the sleeve.* (Def. Ex. V, pg. 34). This distinction I find difficult to follow and as characterized by the defendants is a very marginal, dubious distinction and basis for award of inventive concept. Grashow, in accord with this decision of the Examiner, did cancel the rejected claims that did not contain this limitation for the specifically described means for withdrawal, a nut on the threaded sleeve of the proposed antenna. (Def. Ex. V, pg. 35). It is my judgment, considered and prolonged, that under the Graham reasoning of the Supreme Court (pgs. 34–35, 86 S.Ct. 684), Grashow accepted these important decisions of limitation and rejection of an exterior or outside mounting idea that includes, I think, the topmounting concept claimed by Grashow in this litigation as inventive. Also, I find accepted by Grashow the decision that the use of toggle bolt alone as an engaging means would be unpatentable. These

deletions of members pointed to by plaintiffs as novel, previously unthought-of ideas and creative construction in the art, cast doubt on the assembly being inventive in combination when only the nut on the sleeve seems to me left for consideration as the key addition that attained novel combination for patentability. The plaintiffs refer to expert Kamen's answer to my question when he said the Grashow antenna was not a complicated device but was a concept of importance. (R. 333; see also Def. Ex. V, pg. 25). My interpretation of his answer is there were only, as he put it, lots of mechanics climbing under cars since 1936 who did not come up with the same concept as Grashow for topmounting. Kamen described the Grashow antenna as being "one of the ones that were available at that particular moment (1951) that could be topmounted without putting your hand under the fender to support it." (R. 330).

I find further support that the topmounting idea, just considering it as a thought and mental operation, was contemplated by outside mounting concept of others previous to March 3, 1948, when Grashow filed his application for patent. The Eriksen patent, 2,476,407, filed for in February 1948, patented July 1949; Friedman, 2,496,938, filed September 1946, issued February, 1950; Friedberg, filed April 1947, issued June 1949; Morris, 2,524,534, application August 4, 1947, issued October 1950, in different expressions set forth plainly at least the germ of ideas for topmounting capability and desirability in automobile radio antennas. (Def. Ex. Q). Exhibit P, a Philco catalogue of June 1948, advertised a top-cowl or fender aerial "Installed or Adjusted from Top". (R. 520–3). Although after the date of application by Grashow, this catalogue related by credible and adequate evidence to devices and parts in existence previously. (Exs. Def. N, O; R. 499, 519). From all this, considering it as pure thought, the topmounting idea was not new or novel.

I find also that the use of a clamp bolt or sleeve to exert the withdrawing force in view of the prior knowledge of such use in both the antenna and toggle bolt arts was not inventive, particularly in the light of the emphasis directed to be placed by the Supreme Court upon inquiry into obviousness. (Graham v. John Deere Co., supra, 383 U.S. pg. 4, 86 S.Ct. 684; 35 U.S.C. § 103). The use of a nut to pull upwards I find long known in the the antenna art and in the toggle art from which Grashow devised his swinging arm clamp to grip underneath. (Ludwig Pat. 2,252,671 (1941); Ninow Pat. 1,325,036 (1919)). Grashow has testified that the problem of inserting a toggle bolt with a blind fastener through a floor is the same problem as inserting a blind fastener through an automobile fender. (Ex. F, pgs. 183–185). Defense Expert Potter, a consultant for some years at Brach, described the analogous use made by Grashow for the automobile antenna of the "blind fastener", as he termed it, to secure a fastening device when you cannot get behind a support or a wall. (R. 595–598, 606–9; see also Wheeler Pat. 1,035,399; Pleister Pat. 2,013,503; Ninow Pat. 1,352,035; Ex. R). I see no great leap in inventive thought or practical design of a device from this toggle bolt expedient to its adaptation to the swingable means or pivoted arms of Grashow for the automobile antenna topmount.

The so-called Ward 8 Ball antennas received concentrated attention during the trial and also in the briefing. I recognize—and it is a chief concern in the briefing of the plaintiffs that the two different types marketed in different years not be confused—that the first Ward 8 Ball was based upon the Finke patent of 1947, (Pl. Ex. 59), with two half-balls, one above and one below the fender or cowl, and the later refinement where the underside hemispheric half-ball was shaved on the sides and was based upon Turk (1955). It is also clear to me there is support for the strong contention of the plaintiffs that this early Ward 8 Ball should be considered as in-

capable of topmounting, inasmuch as there is the specific statement in the Turk patent (Col. 1, ls. 21–33, Pl. Ex. 60) that his antenna mounting constituted an improvement on the mounting of the Finke patent because the inner mounting member and other associated parts of Finke it is stated must be inserted from the underside.

Despite the strong arguments to the contrary, I find that the first 8 Ball antennas of Ward based upon the Finke patent, and described by Cejka as the "coca cola" of the industry in 1947, were capable of topmounting as demonstrated at the trial in connection with the drawings for the Philco Part No. 45–3019. (R. 228–232, 479–482, 516–523; Def. Ex. AQ; Def. Exs. N, O). I also find that the Ward 8 Ball, as did the Snyder FC–4 before Grashow possessed the sleeve, a swingable clamping device and nut for a withdrawing force similar in concept to Grashow. (Def. Exs. F, O). I find as credible the testimony of Snyder, a man of long practical experience in the automobile radio antenna business with a company now of 400 employees, that he saw his company's product, the Snyder FC–4, mounted from the top in 1947. (R. 392; Def. Ex. F; R. 405, 472–76).

My findings as related above lead to the conclusion there is bar to the invention to all the claims in issue by reason of file wrapper estoppel, lack of invention over prior art and prior use, and most important of all from my viewpoint the strong conviction is present that the combination claimed as new was an obvious step and mere refinement of elements already in existence and used for the same functions. I conclude the claims remaining in issue of the patent do not meet the strict standards and general level clearly established by the Supreme Court for patentability in the legal sense.

Comparable factual situations, I think, are contained in these legal authorities: Dempster Bros. v. Buffalo Metal Contain-

er Corp., 2 Cir., 352 F.2d 420, cert. den. 384 U.S. 940, 86 S.Ct. 1458, 16 L.Ed.2d 539, wherein at page 422 it was stated that a gooseneck configuration of arms on a front end loader, although an important refinement, was an obvious modification of the rigid arms used by other manufacturers earlier. Other cases quite similar where invalidity was adjudged are: Monroe Auto Equipment Co. v. Superior Industries, Inc., 9 Cir., 332 F.2d 473, cert. den. 379 U.S. 901, 85 S.Ct. 190, 13 L.Ed.2d 175; General Radio Company v. Superior Electric Co., 3 Cir., 321 F.2d 857, cert. den. 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659, reh. den., 376 U.S. 973, 84 S.Ct. 1134, 12 L.Ed.2d 88; AMP, Inc. v. Burndy Corp. et al., 3 Cir., 332 F.2d 236; cert. den. 379 U.S. 844, 85 S.Ct. 84, 13 L.Ed.2d 49; see also Graham v. John Deere Co., supra, 383 U.S. pgs. 22–26, 86 S.Ct. 684). Therefore, my conclusion is—and I am conscious it is a serious one of consequence—that the claims in issue of this patent are invalid for lack of invention.

### IV

*Patent No. 2,917,743 (Pl. Ex. 3)*

The remaining claims of this patent in issue as declared at the trial are 7–9, 13–17 (R. 116). There is not present in my judgment the substance concerning the validity or invalidity issue that called for the detailed discussion relating to the first Grashow patent. I have little difficulty to determine the patent in issue claims are invalid for lack of invention by reason of obviousness and further by reason of prior public knowledge and use. (35 U.S.C. § 103; 35 U.S.C. § 102(a) (g).

This patent seemed to have also an unusual ordeal before a series of patent examiners before issue. (Def. Ex. X, pg. 34; Def. Ex. Y, pgs. 28, 44). The technical language of the patent, exquisitely wordy, is present in the claims with seeming repetitive expression of

the same thing in many different ways. However, I shall use the plain language of the plaintiffs in their brief to describe the patent as it is set forth in this manner.

The claims are admittedly combination claims and recite an organization or combination of structural elements that coact with each other to produce a unitary useful result. The antenna includes an organization of elements at the upper end by which it may be quickly and conveniently secured to the cowl from the top *and* a housing for the whip which permits it to be telescoped below the cowl out of sight and out of danger *and* a coaxial cable which is so connected to the housing and whip that electrical contact with the whip will be, at all times, maintained and which will be so arranged in relation to the housing that the cable and housing may both be inserted through the same small hole in the cowl that accommodates the securing means at the top.

It is conceded that the upper portion of the assembly is fundamentally the same as the antenna of the first Grashow patent, 2,509,563 (Pl. Ex. 1), differing only in minor details. The defendant contends the feature common to each of the claims is the trench in the fender well housing which acts as a space saver, so that the fender well housing and the coaxial cable can be inserted alongside each other through a smaller hole in the automobile fender or cowl. The plaintiffs except to this limitation to the single new feature being only the trench and counter there is no trench in Fig. 6 of the patent, and the tube 6 and patch 63 are new elements also described that allow the coaxial cable to be parallel to and rest substantially against the outer surface of the housing. The plaintiffs also state there is no trench mentioned in Claims 15 and 16. I find, however, that if novelty and inventive differences are to be found from the past reliance must be placed upon the trench concept

for nesting the cable. The tube and patch would not be inventive.

Much of the hardware, as termed in the patent, of this disappearing antenna is old. (Def. Exs. F, L; R. 410–421; 427, 680). I find that the trench for the purpose used in this patent was similarly used in the antenna models made at Brach in 1952 or 1953 independent of Grashow. (Def. Exs. C, D). The plaintiffs argue such models—and they are willing to concede their existence for argument only—were never electrically tested and were abandoned and did not come to public knowledge and use. This argument seems to me slightly inconsistent when compared with the unfair competition contention in this litigation that the models were a secret, valued experimentation by Brach over the years that led to the perfection of Pl. Exs. 39 and 40, which were kept secret and off the market by Brach in 1958.

I do find again, however, the trench concept is common in the electrical industry. (R. 627–30). I find the trench was present in Exs. C and D in sufficiently similar form to the one of this patent and long before its concept by Grashow, that date being settled as November 15, 1956. Mainiero and Migatz leave no doubt about the existence of these models in 1952 and 1953. (Def. Ex. AQ; R. 299–301; 684, 687–692, 702–703; 711–712). I find Wymer of United Motors, an active customer of Brach in the years 1952 and 1953, saw these exhibits C and D and demonstrated some model of that type taken from Brach in Chicago. (R. 554–556; 570, 575). This all occurred so long ago any dimming of memory on his part is understandable to me.

Most important in the decision of invalidity in regard to this patent is the clear indication of obviousness concerning the use of this trench feature for nesting the coaxial cable to make the assembly more compact for insertion from the top. The ease of its concept and readiness of its use for this purpose

is best shown by the testimony of Mainiero that the trench idea in 1952 or 1953 did not come from Grashow, but as he put it, "there were five or six guys, five or six fellows working on that job at that time. *We all had the trench in mind.*" (emphasis supplied). (Def. Ex. AA, pgs. 105–6). This simplicity of concept for many, in my judgment, negatives any inventive contribution of this patent including it to be otherwise accepted than as being a product only of ordinary mechanical or engineering skill. (Concrete Appliances Co. v. Gomery, 269 U.S. 177, 185, 46 S.Ct. 42, 70 L.Ed. 222; see also Lincoln Engineering Co. of Illinois v. Stewart-Warner Corp., 303 U.S. 545, 549, 58 S.Ct. 662, 82 L.Ed. 1008; Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 95 L.Ed. 162; Schaefer, Inc. v. Mohawk Cabinet Co., Inc., 2 Cir., 276 F.2d 204–207). It is my conclusion the patent is invalid for lack of invention due to public knowledge, prior use and no evidence of non-obviousness.

In summary, the defendants are entitled to judgment dismissing the first and second claims set forth in the complaint, and to a declaratory judgment as prayed for in the answer that the claims of the two patents in issue and herein discussed are invalid for lack of invention. Appropriate judgment shall be submitted accordingly by the attorneys for the defendants. (See Matteson v. United States, 2 Cir., 240 F.2d 517; United States v. F. & M. Schaefer Brewing Co., 356 U.S. 227, 78 S.Ct. 674, 2 L.Ed.2d 721).

The exhibits in evidence under the local court Rules are to be returned to the attorneys who introduced them. Because of their bulk the exhibits, including the depositions, shall be retained in my chambers in Albany. I request that the local attorneys for the parties pick them up as promptly as possible. The trial record referred to herein by the symbol "R" will be filed in the office of the Clerk at Utica, New York.